THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILLIAM GILBERTO, RAMOS,

Petitioner,

v.

IRMA YOLANDA, LOPEZ,

Respondent.

No.: 2:18-cv-00180-RSM

REPLY IN SUPPORT OF PETITION FOR
RETURN OF A CHILD TO THE STATE
OF HABITUAL RESIDENCE UNDER
THE HAGUE CONVENTION

## I. INTRODUCTION

In response to the Petition, Respondent Lopez admits she abandoned D.R. in Guatemala, in order to travel to the United States, and sent someone to abduct D.R. a month later.  Lopez did this without Ramos's permission and now refuses to return D.R. to her habitual state of residence—Guatemala.

In apparent desperation, Lopez makes accusations about how Ramos has treated her. These accusations are completely false, and belied by, among other things, the numerous recent text messages Lopez sent Ramos expressing how much Lopez loves and misses Ramos.[1]  More important for this proceeding, these general accusations are not clear and

---

[1] Declaration of William Gilberto Ramos, dated April 2, 2018 ("040218 Ramos Decl.") ¶ 1.

REPLY ISO PETITION FOR RETURN OF A CHILD TO THE STATE
OF HABITUAL RESIDENCE UNDER THE HAGUE CONVENTION
NO.: 2:18-CV-00180-RSM

PAGE 1

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

convincing evidence that the return of D.R. would put D.R. at "grave risk" of harm—the standard for making an exception to the presumption favoring return under the Hague Convention. Ramos's Petition should therefore be granted, and D.R. returned to Guatemala immediately.

## II.  LEGAL ANALYSIS

**A.    D.R. is a habitual resident of Guatemala and must be returned to Guatemala for a custody determination.**

Under Articles 3 and 4 of The Hague Convention on the Civil Aspects of International Child Abduction, a petitioner must satisfy three elements to prove a *prima facie* case:  1) prior to removal or wrongful retention, the child was a habitual resident in a foreign country; 2) the removal or retention was in breach of custody rights under the foreign country's law; and 3) the petitioner actually was exercising custody rights at the time of the removal or wrongful retention. If the petitioner satisfies these elements, the abducted child must be returned to his or her country of habitual residence, unless the respondent can establish that one of the designated affirmative defenses applies.[2]

**1.    Prior to D.R.'s abduction and wrongful retention in the United States, D.R. was a habitual resident of Guatemala.**

Both Ramos and Lopez are citizens of Guatemala. After Lopez became pregnant with Ramos's child, Lopez and Ramos fully intended to establish the habitual residence of that child—D.R.—in Guatemala.

Lopez gave birth to D.R. in Guatemala. Ramos saw D.R. for the first time four days after D.R. was born. Ramos could not see D.R. sooner or more often because he had to work. Otherwise, Ramos would risk losing his job and the only source of money to support

---

[2] 42 U.S.C. § 11603(e)(1)(A) and (B); Hague Convention, Art. 3; see also *Hofmann v. Sender*, 716 F.3d 282, 291 (2d Cir.2013) (quoting *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005)) (internal quotation marks omitted).

REPLY ISO PETITION FOR RETURN OF A CHILD TO THE STATE OF HABITUAL RESIDENCE UNDER THE HAGUE CONVENTION NO.: 2:18-CV-00180-RSM

PAGE 2

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

Lopez and their newborn.[3]  Lopez lived with Ramos, off and on, in his house after D.R. was born.[4]

Lopez then took off for the United States unexpectedly, abandoning D.R. in Guatemala.[5]  Lopez sent someone to Guatemala to abduct D.R.[6]  Ramos never agreed Lopez could take D.R. outside of Guatemala.  From D.R.'s birth—until Lopez abducted her—D.R. was a habitual resident of Guatemala.  Under the Hague Convention, D.R. must be returned.

**2.    Lopez's abduction and wrongful retention of D.R. violated Guatemalan civil law.**

In Guatemala, "Under age children should live with their parents, or the parent or mother that is responsible for them.  Children cannot leave without permission from both parents."[7]  Here, Ramos did not give permission to remove D.R. to the United States, in part, because Ramos does not have the papers necessary to travel here.[8]  Lopez violated Guatemalan civil law by abducting D.R.

Moreover, Ramos has done everything he could under Guatemalan law to get D.R. back.  When Ramos learned that D.R. had been left with Lopez's sister, Glenda, Ramos went to Glenda's house and told Glenda he had a right to see his daughter.[9]  He did not forcibly remove D.R., even though Glenda had many children—about five or six—to take care of,

---

[3] 040218 Ramos Decl. ¶ 5.

[4] *Id.* ¶ 2.

[5] Lopez's Response Letter, filed March 19, 2018, Dkt. 9.

[6] *Id.*

[7] Guatemala's Civil Law, Chapter VII, Parental Authority, ARTICLE 260.  To the best of Ramos' counsel's knowledge, this is Guatemala's civil law.

[8] 040218 Ramos Decl. ¶ 18.

[9] *Id.*

1  which was neglectful of D.R., who was only nine months old at the time.[10]

2      Ramos then attempted to seek custody of D.R. through the court system.  For

3  example, he went to court multiple times, trying to secure custody of D.R.[11]  When Glenda

4  was summoned to court for the third time she stated that D.R. was taken to the United States

5  to be with Lopez, which violated Guatemalan law because Ramos never gave Lopez

6  permission to take D.R. to the United States.

7      **3.     At the time Lopez abducted D.R., Ramos was exercising his custodial
            rights.**

8

9      From just a few days after D.R.'s birth until Lopez abducted D.R., Ramos maintained

10 regular contact with D.R.  Ramos first discovered that Lopez was pregnant with D.R. around

11 February 2015 and never denied he was the father.[12]  He then went to meet D.R. as soon as

12 he could, otherwise Ramos could have lost his job.[13]

13     Lopez and D.R. lived with Ramos, in his house, off and on.[14]  Lopez and D.R.

14 temporarily moved to her parents' house for two months after D.R. was born so that Lopez's

15 mother could help take care of her and D.R.  They returned to their routine of staying at

16 Ramos's house, however, not long afterwards.[15]  Ramos also supported Lopez and D.R.

17 financially—when he returned home from work on the weekends, he gave Lopez money.[16]

18 In this way, Ramos has always exercised his custodial rights over D.R.  D.R. must be

19 _____

20 [10] *Id.*

21 [11] *Id.* ¶ 10.

22 [12] *Id.* ¶ 4.

23 [13] *Id.* ¶ 5.

24 [14] *Id.* ¶ 2.

25 [15] *Id.* ¶ 7.

26 [16] *Id.* ¶ 6.

1  returned to Guatemala for a custody determination.

2  **B.    Lopez has failed to prove the "grave risk" exception applies.**

3      Under Article 13(b) of the Hague Convention, a respondent may argue that a child

4  should not be returned if "there is a ***grave risk*** that his or her return would expose the child

5  to physical or psychological harm or would otherwise place the child in an intolerable

6  situation."[17]  This exception is to be construed narrowly and requires proof by clear and

7  convincing evidence.[18]  In addition, the exception for grave harm to the child is not license

8  for a court in the abducted-to country to speculate on where the child would be happiest.[19]

9  Rather, the question is whether the child would suffer "serious abuse,"[20] that is "a great deal

10  more than minimal."[21]

11      The Ninth Circuit, in *Cuellar v. Joyce*, provided parameters as to what constitutes "a

12  grave risk of harm."[22]  The court found that the father did not establish by clear and

13  convincing evidence that there was a grave risk of harm in returning the child to Panama to

14  live with the mother even though the mother was very poor, the child suffered a head injury

15  while in the mother's care, the child exhibited ataxia, and the child was attached to the

16  United Stated and her father.[23]  The court further held that even well-cared for children

17  occasionally have accidents, there was no evidence that the child was undergoing regular

18  medical treatment in the United States, and an attachment to a new home was not a valid

19  ───────────────

[17] Emphasis added.

20

21  [18] *Foster v. Foster*, 654 F. Supp. 2d 348, 349 (W.D. Pa. 2009) (citations omitted); 42 U.S.C. § 11603(e)(2)(A).

22  [19] *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996) (citations omitted).

23  [20] *Blondin v. Dubois (Blondin II)*, 238 F.3d 153, 163 (2d Cir. 2001).

24  [21] *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000).

25  [22] 596 F.3d 505 (9th Cir. 2010).

26  [23] *Id.* at 509-11.

REPLY ISO PETITION FOR RETURN OF A CHILD TO THE STATE OF HABITUAL RESIDENCE UNDER THE HAGUE CONVENTION NO.: 2:18-CV-00180-RSM

PAGE 5

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1  concern because it was caused by abduction.[24]

2      In this case, as in *Cuellar*, Ramos has presented no evidence that would rise to the

3  level of grave harm to D.R., if she is returned to Guatemala.  Lopez's accusations that Ramos

4  is "abusive" or "aggressive" are simply untrue and belied by the evidence.

5      Lopez told Ramos that she loved him both before and after she left to the United

6  States.  On May 20, 2015, for example, Lopez gave Ramos a birthday card saying "you and

7  our little one are the most important and special people God has given me."[25]  She also

8  continued to communicate with Ramos frequently after she left Guatemala.  She maintained

9  regular video chats and exchanged text message with Ramos in 2017 and 2018.  They

10 discussed, among other things, Lopez getting airline tickets to fly back to Guatemala to be

11 together.[26]  These loving expressions plainly contradict Lopez's accusations.

12     To explain why Lopez is making these false accusations, Ramos believes Lopez is

13 currently pregnant, and has a new partner in the United States.  Lopez does not want her new

14 partner to know that she still communicates with Ramos.[27]

15     The truth is that Ramos did not abuse or threaten Lopez before or after D.R. was

16 born,[28] nor did he threaten Lopez or her family after she moved to the United States.[29]

17 Ramos is not part of a drug cartel.[30]  He is employed by a company called Palo Blanco S.A.[31]

18

---

19 [24] *Id.*

20 [25] **Exhibit C** to 040218 Ramos Decl.

21 [26] **Exhibit D** to 040218 Ramos Decl.

22 [27] 040218 Ramos Decl. ¶ 17.

23 [28] *Id.* ¶ 3.

24 [29] *Id.* ¶ 11.

25 [30] *Id.* ¶ 12.

26 [31] **Exhibit A** and **B** to 040218 Ramos Decl.

Even if Lopez's accusations are true, they are nonetheless insufficient to overcome the clear and convincing standard. This high standard requires proof that ***D.R.*** faces a grave risk of harm should ***D.R.*** return to Guatemala. There is simply no evidence of this before the Court. The grave risk exception to the presumption favoring return, then, does not apply.

**C.    D.R. is not settled in the United States.**

The only other possible exception to the presumption favoring return is found in Article 12 of the Hague Convention. It says that, if the abducting parent can prove the petition for return was filed more than a year after the wrongful removal or retention occurred, and "***that the child is now settled in its new environment***," the abducting parent can overcome the presumption.[32]

In *B. Del C.S.B.*, the Ninth Circuit considered a number of factors in determining whether a child is settled within the meaning of Article 12, including:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability. In some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of deportation. Although all of these factors, when applicable, may be considered in the "settled" analysis, ordinarily the most important is the length and stability of the child's residence in the new environment.[33]

Applying those factors, the court concluded, that "a child such as Brianna who has five years of stable residence in the United States, coupled with academic and interpersonal success

---

[32] Hague Convention art. 12 (emphasis added); see also 42 U.S.C. § 11603(e)(2)(B); *In re B. Del C.S.B.*, 559 F.3d 999, 1003 (9th Cir. 2009).

[33] *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009).

REPLY ISO PETITION FOR RETURN OF A CHILD TO THE STATE
OF HABITUAL RESIDENCE UNDER THE HAGUE CONVENTION
NO.: 2:18-CV-00180-RSM

PAGE 7

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1  here, may be 'settled' within the meaning of Article 12, despite her unlawful status."[34]

2  In this case, there is no evidence that D.R., like Brianna in *B. Del C.S.B.*, is settled in

3  the United States.  At two years and six months old, D.R. is far younger than Brianna, who

4  was eleven at the time the Ninth Circuit decided she was "settled."  Instead of being in the

5  United States for five years, D.R. has been here for only 1.5 years.

6  There is no evidence that D.R. attends school or day care consistently, or has any

7  friends in the area with whom she has made a close connection.  It is also unlikely that

8  D.R.—as a toddler—has the ability to establish close community connections, through team

9  sports or youth groups.

10  In addition, Lopez submitted no evidence of employment and financial stability.  The

11  fact that Lopez is expecting another child, and the expense and time necessary to take care of

12  an infant, cannot help in this regard.  Given the lack of evidence to establish that D.R. is

13  settled in the United States, Lopez cannot overcome the presumption in favor of return, and

14  D.R. must returned to Guatemala.

15  ### III.  CONCLUSION

16  Ramos respectfully requests this Court order the return of D.R. to Guatemala

17  immediately for a custody determination.

18  //

19

20  //

21

22  //

23

24

---

25  [34] *Id.* at 1012; see also *Margain v. Ruiz-Bours*, 592 F. App'x 619, 620-21 (9th Cir. 2015) (child's

26  psychology expert testified that the child has friend with whom "she's very involved," and that she
likes her school and teacher, and another person testified she has friends in the area).

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1  DATED:  April 2, 2018

2                                            BULLIVANT HOUSER BAILEY PC

3

4                                            By  /s/ Matthew J. Sekits

5                                                 Matthew J. Sekits, WSBA #26175
                                                  E-mail:  matthew.sekits@bullivant.com
6                                                 Jayme N. Mori, WSBA #50578
                                                  E-mail:  jayme.mori@bullivant.com
7
                                             Attorneys for William Gilberto Ramos
8

9    4815-7371-0431.1
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on April 2, 2018, I caused to be served the foregoing

REPLY IN SUPPORT OF PETITION FOR RETURN OF A CHILD TO THE STATE OF

HABITUAL RESIDENCE UNDER THE HAGUE CONVENTION on the following parties:

Irma Yolanda Lopez
c/o Domingo Lopez
710 Everson Road, Apt. 4
Everson, WA 98247-9761
(360) 927-0313 (Telephone)

*Pro Se Defendant*

by:

☐ hand delivery
☐ E-mail
☒ first class mail
☒ ECF filing

I declare under penalty of perjury under the laws of the United States this 2nd day of

April, 2018, at Seattle, Washington.

*/s/ Kristin Anderson*
Kristin Anderson, Legal Assistant

REPLY ISO PETITION FOR RETURN OF A CHILD TO THE STATE
OF HABITUAL RESIDENCE UNDER THE HAGUE CONVENTION
NO.: 2:18-CV-00180-RSM

PAGE 10

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930